## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ALLENE R. ROECKER,**

                    **Plaintiff,**

**v.**

**MEGAN BRENNAN,**                                        **Case No. 15-7201-DDC-JPO**
**Postmaster General of the**
**United States Postal Service,**

                    **Defendant.**

_____

## MEMORANDUM AND ORDER

Plaintiff Allene R. Roecker brings this employment discrimination action against

defendant Megan Brennan, as Postmaster General of the United States Postal Service.  This

matter is before the court on defendant's Motion for Summary Judgment (Doc. 46).  Plaintiff

responded to defendant's motion (Doc. 50).  And, defendant filed a Reply (Doc. 53).  The matter

thus is fully briefed, and ripe for ruling.  After considering the parties' arguments, the court

grants in part and denies in part defendant's summary judgment motion.  It explains why, below.

### I.       Uncontroverted Facts

The following facts are uncontroverted or, where controverted, are stated in the light

most favorable to plaintiff, the party opposing summary judgment.  *Scott v. Harris*, 550 U.S.

372, 378 (2007).

### *Plaintiff's Employment with USPS*

Plaintiff has worked for the United States Postal Service ("USPS") in its Kansas City,

Kansas Network Distribution Center ("NDC") since 1987.  In 1998, plaintiff sustained injuries to

her left shoulder and left elbow while performing work duties.  On April 10, 1999, plaintiff filed

a notice with the Department of Labor's Office of Workers Compensation Program ("OWCP") for work-related injuries to her left elbow. OWCP accepted plaintiff's workers' compensation claim. When it accepts a workers' compensation claim, OWCP pays an employee's medical bills, lost wages, and lost time for attending therapy and medical appointments. Plaintiff also continued to receive all of her employee benefits from USPS.

On July 17, 2002, USPS offered plaintiff a Modified FT Distribution Clerk position, a Grade Level 5 position that was tailored to meet plaintiff's physical needs at the time. Plaintiff accepted that position on August 17, 2002.

On April 14, 2008, the OWCP gave plaintiff a 1% permanent impairment rating for her right elbow under the schedule award provisions of the Federal Employees' Compensation Act ("FECA"). On April 15, 2008, the OWCP gave plaintiff a 4% permanent impairment rating for her left shoulder under the FECA schedule award provisions.

### Plaintiff's Rehabilitation Modified Position

The USPS has implemented a program called the National Reassessment Process ("NRP"). The NRP works to ensure that employees who have sustained on-the-job injuries are performing necessary work available within their restrictions and not "made up" work. The NRP requires all employees on limited or modified duty to obtain updated restrictions from their physicians. Plaintiff updated her medical restrictions on May 19, 2008.

Limited duty and rehabilitation modified jobs at USPS are generated through a department called In-Plant Support. NDC's In-Plant Support works with USPS's Injury Compensation department to identify available job tasks within the facility where the injured employee works and that the injured employee could perform within her restrictions.

2

On June 25, 2008, USPS offered plaintiff a rehabilitation modified position as a Parcel Post Distribution Machine Clerk, Grade Level 6 ("Machine Clerk position"). Plaintiff accepted the Machine Clerk position. It included the following job duties: walking through the facility and looking through containers and discharges to check the accuracy of mail within the container or discharge; checking for accuracy of placarding, labeling, and signage through the mail flow; reporting discrepancies within the mail flow to In-Plant Support or a supervisor as directed; assisting with placarding and labeling changes as needed; assisting with drop shipment paperwork; and assisting in the Loose-In-Mail section with separating mail, notifications, and letters. The description for the Machine Clerk's position listed the physical activity required to perform these job duties. These requirements fell within plaintiff's May 19, 2008 work-related restrictions. The requirements included lifting up to 20 pounds intermittently, up to 4 hours per day; standing/walking intermittently, up to 3 hours at a time, up to 6 hours per day; bending/stooping/twisting, intermittently and up to 4 hours per day; reaching above the shoulder, intermittently, up to 30 minutes at a time and up to 1 hour per day; simple grasping, continuously, not more than 1 hour at a time, intermittently, up to 4 hours at a time; and fine manipulation, intermittently, up to 30 minutes at a time.

Plaintiff is able to perform the required functions and duties of the Machine Clerk position that she accepted in June 2008. When asked what USPS should have done to reasonably accommodate plaintiff's medical condition that it had not already done, plaintiff testified that she was "not sure." Doc. 47-2 at 38.

### *Plaintiff's Medical Restrictions*

Plaintiff is substantially limited in her abilities to walk, stand, bend, stoop, twist, reach, push, lift, grasp, finely manipulate, perform manual tasks, and work. Within her May 19, 2008

restrictions, however, plaintiff can drive her car (including turning the key), tie her shoes, bathe,

shower, dress herself, and walk and stand intermittently up to three hours at a time.  But her

restrictions affect her ability to prune rose bushes, perform yard work, take out the trash, make

her bed, and sort laundry.  Plaintiff also has difficulty pushing grocery carts that have bad

wheels.  The restrictions also limit plaintiff's ability to walk or stand at functions to two to three

hours at a time.  And, the restrictions affect her ability to bend and stoop to interact with her

granddaughter and children at church.

Plaintiff's lifting restriction makes it harder for her to lift cases of pop, water, or any

other bulky item at the store.  Plaintiff's grasping restriction causes fatigue in her hands after she

cooks a large meal.  Plaintiff cannot host many holiday events because of the extra work

involved with cutting and fixing salads.  Plaintiff's grasping restriction also limits her ability to

vacuum and, sometimes, affects her ability to take care of her hair.

### *Plaintiff's Supervisors and Work Assignments*

USPS employed Lovie Watson as the Supervisor of Distribution Operations at the NDC.

In 2009, Ms. Watson became plaintiff's supervisor in the Secondary Unit.  In December 2010,

Ms. Watson received a list of jobs that In-Plant Support and Injury Compensation agreed were

available in the facility and within plaintiff's restrictions.  Ms. Watson then used this list to

assign plaintiff work, when needed.

USPS employed Latrone Slade as Manager of Distribution Operations at the NDC.  In

this position, Mr. Slade could assign job duties to plaintiff indirectly through plaintiff's

supervisor.  But he did not always find plaintiff's supervisor before he assigned her work.  For

example, if plaintiff was standing in front of him, he would assign her tasks without speaking

first to her supervisor.  Between 2010 and 2013, Pamela Lackner was Acting Manager of

Distribution Operations when Latrone Slade was absent.  During this time, Ms. Lackner also could assign plaintiff job duties.  Plaintiff's supervisors were aware that plaintiff was a modified duty rehabilitation employee with work-related restrictions.  But, plaintiff's supervisors did not consider her medical restrictions as "disabilities."

The USPS Rehabilitation Assignment Priority Policy authorizes a supervisor to assign rehabilitation employees to perform other work in the facility if adequate duties are not available within their work restrictions in their regularly assigned areas.  After Ms. Watson began supervising plaintiff, she noticed that the specific tasks listed on plaintiff's June 25, 2008 modified rehabilitation job offer did not fill an 8-hour workday.  So, after considering plaintiff's medical restrictions, the availability of other employees to perform the work, and the needs of the postal service each day, Ms. Watson assigned plaintiff other duties.

Plaintiff's supervisors daily instructed plaintiff that she should not perform work outside of her medical restrictions.  And, they instructed her to find a supervisor when her restrictions were exhausted so that she could receive a new assignment.  Generally, Ms. Watson assigned plaintiff to work in areas where work was available in the Clerk Craft, but if no duties in that department that met plaintiff's medical restrictions were available, Ms. Watson would assign plaintiff to debris/loose mail duties in the Mail Handler Craft.  Ms. Watson also assigned plaintiff the task of hanging sacks because she could perform this duty within her restrictions. After assigning plaintiff her work duties, supervisors did not watch plaintiff performing the assigned tasks because supervisors walked through other parts of the facility or worked the floor.

Although plaintiff's supervisors instructed her not to perform work beyond her restrictions, plaintiff testified that her supervisors assigned her work that exceeded her restrictions.  Plaintiff asserts that Ms. Watson did not allow her to take necessary breaks,

assigned her duties beyond her simple grasping restriction, and required her to perform the debris/loose mail duties in the Mail Handler Craft—an assignment that violated her lifting restrictions.  When plaintiff complained to Ms. Watson about violations of her work restrictions, Ms. Watson told her it was the only work available and that she decided where plaintiff would work because she was the supervisor.  But, on one occasion, plaintiff informed Ms. Watson that she could not perform the slides work because it was unsafe.  In response, Ms. Watson assigned plaintiff a different task.  She also never assigned plaintiff the slides work again.  Plaintiff also testified that even when work was available in the Clerk Craft that she could perform, she was assigned to perform the debris/loose mail duties in the Mail Handler Craft—a task that exceeded her restrictions.  Plaintiff also testified that both Mr. Slade and Ms. Lackner assigned her duties that exceeded the scope of her restrictions.

When Ms. Watson was unable to find an employee at his or her work assignment, she would page the employee to locate the employee.  Ms. Watson thinks she paged plaintiff less often than she paged other employees.  But, Ms. Watson paged plaintiff on several occasions when she was taking her rest breaks.  Plaintiff believes that Ms. Watson was harassing her by paging her to come back to work.

### *Plaintiff's Specific Job Assignments*

One of the specific tasks that plaintiff's supervisors assigned her to perform was drop shipment paperwork duties.  When assigning plaintiff this work, her supervisors only expected her to highlight eight fields on a 8125 form to ensure the paperwork was complete.  Depending on the Dock Clerk's preference, plaintiff could make phone calls to get fax copies of the original form from the originating postal unit.  Each supervisor expected plaintiff to perform these tasks within her medical restrictions.  A former Dock Clerk asserts that he saw plaintiff performing

6

additional duties associated with the drop shipment paperwork.  He states that plaintiff performed every job task except turning on the computers and signing the 8125 forms.  But, the former Dock Clerk does not assert that plaintiff's supervisors required her to perform these additional duties.

Another task that plaintiff performed was EVS sampling duties.  This task required plaintiff to weigh samples of packages.  Dock Clerks collected the samples and put them in hampers.  Plaintiff then weighed them with a scanner and a scale, and plaintiff next placed the scanner in a cradle to download the information scanned.  Plaintiff then would write down the work completed that week and provide it to In-Plant Support.  Plaintiff's supervisors instructed plaintiff to work within her medical restrictions when performing EVS sampling.  But, plaintiff asserts that she was assigned to sort through multiple mailers and scan boxes that exceeded her medical restrictions.

Plaintiff also requested to perform the Loose-In-Mail job duties because they were part of her modified job duties.  Plaintiff complained about her supervisors assigning her to perform EVS sampling duties when Loose-In-Mail work was available.  But the Loose-In-Mail job was a bid position, and if the volume of Loose-In-Mail work did not supply enough work for both the bid position and plaintiff to perform, the bid position would perform the work, not plaintiff.

### Plaintiff's Responsibilities as a Rehabilitation Employee

Plaintiff's supervisors must assign plaintiff work duties that are within her restrictions.  And, plaintiff is responsible for performing her assigned work duties in a way that does not exceed her medical restrictions.  Plaintiff's supervisors expected plaintiff to refuse any job assignment that she believed was outside her medical restrictions.  Also, plaintiff's union

steward advised plaintiff that she could refuse to perform job duties that exceeded the scope of her restrictions.

Plaintiff was responsible for taking periodic breaks or rest periods, for informing her supervisor when she needed to sit down, for performing jobs as long as she could within her restrictions, for letting a supervisor know when she had exhausted her restrictions so she could receive another assignment, and for asking for help to perform tasks that exceeded her weight restriction.

### *Plaintiff's Paid Leave in 2011*

On September 13, 2011, plaintiff requested leave for dependent care because her husband was undergoing surgery. Ms. Watson granted plaintiff's leave request. So, plaintiff attended her husband's surgery on September 20, 2011, and did not report to work. USPS placed plaintiff on paid leave status for that day.

### *Plaintiff's Belief That She Deserved Higher Pay*

In May 2016, plaintiff was earning $56,000 from her employment at USPS. Only USPS managers and supervisors can authorize a higher level of pay for an employee. In-Plant Support determined the level of pay for employees' jobs and duties. Supervisors on the floor did not make pay determinations.

During plaintiff's employment, Ms. Watson learned from her supervisor that plaintiff was clocking into work using the wrong operation number. Plaintiff was using the operation number for drop shipments because she thought she was entitled to a higher rate of pay—the same rate of pay that the Dock Clerk (a Grade Level 7 position) received. Ms. Watson told plaintiff that she was using the wrong operational number to clock in. And, Ms. Watson deleted plaintiff's incorrect clock rings and replaced them with the operation code for Grade Level 6 pay—the pay

rate assigned to plaintiff's job.  Ms. Watson deleted plaintiff's incorrect clock rings because they caused the system to reflect that two Dock Clerks were working when USPS had authorized only one Dock Clerk to work at a time.

As described above, plaintiff performed EVS sampling as part of her modified job duties. Plaintiff performed the EVS sampling duties assigned to Vicki Hackett when she was on vacation.  Ms. Hackett was a Clerk assigned to the BMEU, a separate postal unit.  Performing the EVS sampling was only a portion of Ms. Hackett's job duties.  Later, USPS moved the BMEU employees at NDC to another facility.  After that occurred, plaintiff and other employees performed the EVS sampling duties that Ms. Hackett used to perform at NDC.  Plaintiff contends that she should receive a higher level of pay for performing the EVS scans because Ms. Hackett was paid at a higher level in her position as BMEU clerk.

An employee named Z. Malik was assigned the Grade Level 7 duty of reading the operational numbers that employees had entered to verify their accuracy.  Mr. Malik only performed this function for a limited amount of time each day.  The task could last about 20 minutes to an hour.  Plaintiff thought that Mr. Malik was using a higher level operating number when he performed EVS sampling.  Mr. Malik told plaintiff the number he was using for EVS sampling, and plaintiff began entering that same number when she performed EVS sampling. Plaintiff believed she was entitled to a higher rate of pay when she performed EVS sampling. Mr. Malik did not receive a higher level of pay for any Dock Clerk functions that he performed along with plaintiff.

### Plaintiff's Communications with her Union Steward

Plaintiff spoke to her union steward many times about her concerns with her working conditions, including her belief that supervisors were assigning her work outside of her medical

restrictions.  Plaintiff gave her union steward written statements about these concerns.  Plaintiff thought the union would file a grievance based on her complaints.  The union never did.

When an employee asks to speak with a union steward, USPS supervisors follow a general rule of arranging the meeting within two hours.  But, the timing of the meeting depends on the union steward's availability, any pressing needs on the job that the employee must perform, and the mail volume.  Whenever plaintiff asked to speak with a union steward, she provided Ms. Watson a carbon copy of a routing slip.  Ms. Watson would initial the slip, and plaintiff and Ms. Watson would each keep a copy.  If Ms. Watson's initials are not on the slip, then plaintiff probably did not provide the routing slip to Ms. Watson.

### *Plaintiff's Complaints*

On September 21, 2010, plaintiff contacted an EEO counselor to file an informal EEO complaint alleging that Ms. Watson and Ms. Lackner were assigning plaintiff work outside of her medical restrictions.  Plaintiff also asserted that Ms. Watson and Ms. Lackner did not allow her to see her union steward.  Plaintiff resolved the September 2010 complaint to her satisfaction, and she withdrew the complaint in December 2010.

On November 31, 2011, plaintiff filed a formal discrimination complaint.  She alleged retaliation and disability discrimination.  Her complaint asserted the following alleged discriminatory acts:

> (1) On September 17, 2011, Complainant became aware that her supervisor deleted her clockrings without her knowledge, (2) on September 13, 2011, the Complainant was told that she would be denied sick leave dependent care, (3) since April 2010, the Complainant was instructed to perform work outside of her work restrictions (i.e., hanging sacks and loose debris), (4) since June 2010 through the present, the Complainant has been assigned to perform dock clerk shipment duties, but [has] not been paid higher level pay for performing those higher level duties, (5) since September 10, 2010, the Complainant was denied time to speak with her union steward, (6) since May 13, 2010, the Complainant

was instructed to work in the mail handler craft while work was still available in
her clerk craft.

Doc. 47-21 at 5.  The EEO office allowed plaintiff to amend this complaint to include allegations
asserted in a February 13, 2012 informal EEO complaint, and a March 9, 2012 letter from her
representative.  Plaintiff's February 13, 2012 informal complaint asserted that she "was assigned
work in the mailhandler craft when work was available in my clerk craft."  Doc. 47-23 at 2.

The Administrative Law Judge ("ALJ") consolidated the information in plaintiff's
representative's letter and included plaintiff's hostile work environment claim in the November
31, 2011 formal complaint.  Plaintiff's hostile work environment claim alleged specific incidents
of harassment beginning January 3, 2013 and lasting through February 9, 2013.  These incidents
included the following:  (1) on January 3, 2013, Mr. Slade told plaintiff to perform EVS
sampling during her sit down/rest period; (2) on January 5, 2013, plaintiff was performing EVS
sampling daily, no one else was current on training, and plaintiff was complaining about doing
the EVS sampling because she believed Loose-In-Mail duties were available; (3) on January 31,
2013, Ms. Watson asked Ben Brown "what eVS sample scans were necessary [and] how long it
takes to do them" (Doc. 47-24 at 3); (4) on February 2, 2013, Mr. Slade asked plaintiff "why it
took 4 hours to do [the] Morning Report," and plaintiff advised that she "cleared/expediting mail
missed while doing report—would gladly stop." (*id.*); (5) on February 6, 2013, Ms. Watson
advised plaintiff that the Morning Report should only take two hours, plaintiff responded with
the reason why it was taking her so long to complete the report, and Ms. Watson suggested going
around with plaintiff while she completed the report to determine what took so long; and (6) on
February 9, 2013, Ms. Watson instructed plaintiff to "take mail on in-house to do eVS sample
scans," which required plaintiff "to pull 14 NMOs from Gaylord box on DK 19 trailer.  Weight
for one NMO was over 21 lbs after putting on scale.  London Bonds, APP's SDO, took the NMO

from scale [and] put back in Gaylord box on Fed Ex PRS trailer at DK 19 (drop [and] pick Fed Ex trailer)" (*id.* at 4).

## II.        Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "no genuine dispute" about "any material fact" exists and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Plaintiff asserts that defendant discriminated against her based on a disability by failing to accommodate her, subjecting her to disparate treatment, subjecting her to unlawful harassment and a hostile work environment, and retaliating against her. Plaintiff alleges that defendant's actions violated the Rehabilitation Act of 1973 ("Rehabilitation Act"), the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended.

Defendant moves for summary judgment against all of plaintiff's claims. Defendant argues that plaintiff's claims cannot survive summary judgment because: (1) plaintiff is not an individual with a disability; (2) even if plaintiff is disabled, defendant reasonably accommodated her; (3) defendant did not engage in any adverse employment actions or retaliation against plaintiff; (4) plaintiff cannot show pretext; and (5) plaintiff was not subject to a hostile or abusive work environment because of her disability. The court addresses each argument, in turn, below.

### A.  Individual with a Disability

The ADAAA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). When a plaintiff seeks to prove disability discrimination using circumstantial evidence, the Tenth Circuit analyzes the claim under "the analytical

framework first articulated in *McDonnell Douglas* in the context of Title VII claims." *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1217 (10th Cir. 2010) (quoting *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)). Under this framework, the plaintiff first must establish a prima facie case of discrimination under the ADAAA by showing: "(1) [she] is disabled as defined under the ADAAA; (2) [she] is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job; and (3) [she] was discriminated against because of [her] disability." *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016) (citing *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015)). If the plaintiff establishes a prima facia case of discrimination, "'the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision.'" *Johnson*, 594 F.3d at 1217 (quoting *MacKenzie*, 414 F.3d at 1274). If the defendant articulates a nondiscriminatory reason, "the burden shifts back to plaintiff to show a genuine issue of material fact" that the defendant's proffered reason is a pretext designed to mask discrimination. *Id.* (quoting *MacKenzie*, 414 F.3d at 1274).

Defendant contends that plaintiff cannot establish a prima facie case of discrimination because she is not disabled under the ADAAA. In 2008, Congress passed the ADAAA "with the stated goal of ensuring that [t]he definition of disability . . . be construed in favor of broad coverage." *Adair*, 823 F.3d at 1305 (citation and internal quotation omitted). To meet this goal, Congress amended the definition of the term "disability." *Id.* Under the ADAAA's amended definition, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).

Plaintiff asserts that her elbow and shoulder impairments constitute a disability within the meaning of subsection (A) above because they constitute an impairment that substantially limits one or more major life activities.  "To establish an ADA disability under subsection (A), . . . a plaintiff must 'articulate with precision' both her impairment and the major life activity it substantially limit[s]."  *Johnson*, 594 F.3d at 1218 (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003)).  The Tenth Circuit has construed "the phrase 'substantially limiting' to require an impairment that renders an individual either unable or significantly restricted in ability to perform a major life activity 'compared to the average person in the general population.'"  *Rhodes v. Langston Univ.*, 462 F. App'x 773, 778 (10th Cir. 2011) (quoting *Johnson*, 594 F.3d at 1218).  The ADAAA includes the following in the definition of major life activity:  caring for oneself, performing manual tasks, walking, standing, lifting, and bending.  42 U.S.C. § 12102(2)(A).

Plaintiff contends that her impairments substantially limit her ability to engage in the major life activities of walking, standing, bending, stooping, twisting, reaching, pushing, lifting, grasping, fine manipulation, performing manual tasks, and working.  In May 2008, plaintiff's doctor completed a form by opining that plaintiff's impairments require the following restrictions:  lifting up to 20 pounds intermittently, up to 4 hours per day; standing/walking intermittently, up to 3 hours at time, up to 6 hours per day; bending/stooping/twisting, intermittently up to 4 hours per day; reaching the above shoulder, intermittently, up to 30 minutes at a time up to 1 hour per day; simple grasping, continuously, not more than 1 hour at a time, intermittently, up to 4 hours at a time; and fine manipulation, intermittently, up to 30 minutes at a time.

Plaintiff testified that her impairments limit her ability to perform certain tasks.  Plaintiff testified that her lifting restriction makes it harder for her to lift cases of pop, water, or any other bulky item at the store.  Plaintiff also testified that her grasping restriction causes fatigue in her hands after she cooks a large meal.  Plaintiff claims she is unable to host many holiday events because of the extra work involved cutting and fixing salads.  Plaintiff's grasping restriction also limits her ability to vacuum and sometimes affects her ability to take care of her hair.  Although plaintiff conceded that she can drive her car (including turning the key), tie her shoes, bathe, shower, dress herself, and walk and stand intermittently up to three hours at a time, she also testified that her restrictions limit her ability to prune rose bushes, perform yard work, take out the trash, make her bed, sort laundry, push grocery carts with bad wheels, walk or stand at functions to two to three hours at a time, and bend and stoop to interact with her granddaughter and other children.

Defendant asserts that no reasonable jury could conclude from the summary judgment facts that plaintiff is disabled under the ADAAA.  Defendant contends that plaintiff's work restrictions do not render her disabled simply because they exist.  Defendant also argues that plaintiff's testimony does not establish that her impairments substantially limit her capacity to perform major life activities.  The court finds that a reasonable jury could conclude from these facts that plaintiff does not have a disability as the ADAAA defines that term.  But, the court also concludes that a reasonable jury could find that plaintiff's impairments substantially limit one or more major life activities.  *See Sanchez v. Vilsack*, 695 F.3d 1174, 1179–80 (10th Cir. 2012) (concluding that summary judgment was inappropriate because plaintiff had produced sufficient evidence for a jury to conclude that her impairment substantially limited her ability to see); *see also Lohf v. Great Plains Mfg., Inc.*, No. 10-1177-RDR, 2012 WL 2568170, at *4–6 (D. Kan.

July 2, 2012) (concluding a reasonable factfinder could find that plaintiff's 25 to 30–pound lifting restriction substantially limited in his ability to lift, even though it was "a close question"). Thus, the court cannot properly decide this issue on summary judgment.

Defendant argues that the court should follow Judge Lungstrum's holding in *Clarke v. Mortg. Lenders of Am., LLC*, No. 14-2526-JWL, 2016 WL 1030039 (D. Kan. Mar. 10, 2016), and conclude that plaintiff here has failed to establish that she is disability under the ADAAA. In *Clarke*, the plaintiff asserted that his traumatic brain injury constituted an ADAAA disability because it limited two major life activities—his organizational skills and his short-term memory capability. *Id.* at *3. Judge Lungstrum found plaintiff's assertion "entirely conclusory" with "no evidence in the record to support it" because "[t]here [was] no evidence from any physician or medical expert from which a jury could conclude that a causal relationship exists between plaintiff's brain injury and his impaired organizational skills;" "[t]here [were] no medical records establishing a connection between plaintiff's brain injury and his problems with organization;" and "plaintiff's impairment [was] not so obvious from the facts that the court [could] assume it substantially limits a major life activity." *Id.* But the summary judgment facts here are different. Unlike *Clarke*, plaintiff has submitted evidence from her physician that establish a need for work restrictions. Plaintiff's physician opined that her impairments limit her ability to perform certain physical tasks. Plaintiff also testified about how these impairments limit activities in her daily life. The court thus concludes that the facts here differ materially from those Judge Lungstrum considered in *Clarke*.

In contrast, plaintiff here has adduced sufficient evidence for a rational jury to find that plaintiff is disabled in the sense the ADAAA defines that term. In reaching this decision, the court recognizes that the ADAAA's implementing regulations instruct that "substantially limits"

"is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  Also, the Circuit has

explained that "whether [an] impairment substantially limits a major life activity is ordinarily a

question of fact for the jury."  *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142

(10th Cir. 2011).  Applying these standards, the court finds that the summary judgment record

presents genuine issues of fact whether plaintiff's shoulder and elbow impairments substantially

limit her ability to perform major life activities.  The court thus denies summary judgment on

this basis.

### B.  Reasonable Accommodation

Defendant next asserts that, even if plaintiff is disabled under the ADAAA, she has failed

to come forward with admissible evidence to support a conclusion that defendant failed to

accommodate her because, defendant contends, USPS provided plaintiff with reasonable

accommodations for her disability.  "To prevail on a failure-to-accommodate claim a plaintiff

must demonstrate that:  (1) she is disabled; (2) she is 'otherwise qualified'; and (3) she requested

a plausibly reasonable accommodation."  *Sanchez*, 695 F.3d at 1177.  The ADAAA's

implementing regulations define "reasonable accommodation" as:

> (i) Modifications or adjustments to a job application process that enable a
> qualified applicant with a disability to be considered for the position such
> qualified applicant desires; or
>
> (ii) Modifications or adjustments to the work environment, or to the manner or
> circumstances under which the position held or desired is customarily performed,
> that enable an individual with a disability who is qualified to perform the essential
> functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a
> disability to enjoy equal benefits and privileges of employment as are enjoyed by
> its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o).  But, the regulations do not require an employer to provide a reasonable accommodation that imposes an "undue hardship" considering the cost, financial resources, and the operation of the entity.  29 C.F.R. § 1630.2(p).

A court must consider "two components" in the reasonable accommodation analysis. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1265 (10th Cir. 2010).  First, the court asks "whether a reasonable accommodation would enable the employee to do the particular job."  *Id.* (quoting *Gonzagowski v. Widnall*, 115 F.3d 744, 747 (10th Cir. 1997)).  Second, the court considers "whether the employee could be transferred to other work which could be done with or without accommodation."  *Id.* (quoting *Gonzagowski*, 115 F.3d at 747).  The ADAAA implementing regulations "envision an interactive process that requires participation by both parties."  *Id.* (quoting *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998)).

Defendant asserts the undisputed facts establish that it reasonably accommodated plaintiff by offering her two different modified jobs.  Defendant offered and plaintiff accepted the first job in 2002.  The position was a Modified FT Distribution Clerk position, a Grade Level 5 position that was tailored to meet plaintiff's physical needs.  Defendant offered and plaintiff accepted a second job in 2008.  The position was the Machine Clerk position.  This job was a rehabilitation modified position as a Parcel Post Distribution Machine Clerk, Grade Level 6.  Defendant asserts that plaintiff never complained that she needs additional accommodations to perform her modified position.  And, plaintiff testified that she cannot identify any other reasonable accommodations that would assist her in performing her job duties.

Plaintiff concedes that defendant offered her modified positions meant to accommodate her disability.  But, plaintiff asserts, defendant's accommodations were not adequate because she was asked to perform work beyond her restrictions.  Plaintiff testified that she was assigned work

that exceeded her restrictions.  Specifically, plaintiff claims that Ms. Watson did not allow her to take necessary breaks, assigned her duties beyond her simple grasping restriction, and required her to perform the debris/loose mail duties in the Mail Handler Craft which violated her lifting restrictions.  Plaintiff complained to Ms. Watson about the assignment of job duties exceeding her restrictions.  In response, Ms. Watson told plaintiff it was the only work available and that she decided where plaintiff would work because she was the supervisor.

Defendant disputes these facts.  Defendant asserts that plaintiff's supervisors instructed her on a daily basis that she should not perform work outside of her medical restrictions.  The supervisors also instructed plaintiff to find them when her restrictions were exhausted so that she could receive a new assignment.  And, the instructors expected plaintiff to ask for help if she needed and refuse to perform assignments outside her restrictions.  Defendant asserts that plaintiff was responsible for working within her restrictions and, if plaintiff performed work outside of her restrictions, she made the choice to do so.

Defendant also argues that, on at least one occasion, plaintiff informed Ms. Watson that she could not perform the slides work because it was unsafe, and, in response, Ms. Watson assigned plaintiff a different task and never assigned her that task again.  Defendant argues that these facts demonstrates that it provided plaintiff reasonable accommodations.  Defendant dismisses plaintiff's testimony about her complaints to supervisors when, she contends, they required her to work outside her restrictions.  Defendant refers to this testimony as "self-serving."  *See*, *e.g.*, Doc. 53 at 46.

A rational jury might find that plaintiff's testimony is, in fact, "self-serving."  But the governing procedural standard does not permit the court to make that determination on summary judgment.  *See*, *e.g.*, *Sorrentino v. IRS*, 383 F.3d 1187, 1198 (10th Cir. 2004) (Seymour, J.,

dissenting) ("The self-serving quality of the testimony goes to its credibility, which is to be judged by the trier of fact.  Credibility determinations are not to be made at summary judgment . . . .").

On this record, the court cannot conclude as a matter of law that defendant provided plaintiff with reasonable accommodations.  Plaintiff's testimony conflicts with her supervisors' testimony.  A reasonable jury could conclude from these facts that plaintiff's supervisors instructed her to work within her restrictions, and plaintiff's failed to follow her responsibility of identifying tasks that exceeded her restrictions, refusing to perform such tasks, or asking for help with such tasks.  But, a reasonable jury also could believe plaintiff's testimony that her supervisors regularly assigned her work that exceeded her restrictions, and, when she complained to her supervisor, Ms. Watson told her that she had to perform work, even though it violated her restrictions.  The court thus concludes that genuine issues of fact exist whether defendant provided plaintiff with reasonable accommodations.  The court denies summary judgment on this basis.

### C.  Adverse Employment Actions

Defendant next asserts that plaintiff cannot establish that defendant engaged in any adverse employment actions to support her discrimination and retaliation claims.  Defendant also argues that plaintiff cannot establish a temporal or causal link between an alleged adverse action and her disability or protected activity to maintain a discrimination or retaliation claim.

To establish an ADAAA discrimination claim, "a plaintiff generally must show that [s]he has suffered an 'adverse employment action because of the disability.'"  *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)).  And, "[t]o establish a prima facie case of ADA retaliation, a plaintiff

must prove that (1) [s]he 'engaged in a protected activity'; (2) [s]he was 'subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity'; and (3) there was 'a causal connection between the protected activity and the adverse employment action.'" *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186–87 (10th Cir. 2016) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)).

An adverse action is one that produces "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 761 (1998). It does not include "petty slights, minor annoyances, and simple lack of good manners." *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quoting *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The court considers whether an action is adverse on a case-by-case basis, using an objective standard and "examining the unique factors relevant to the situation at hand." *Id.* (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)).

Plaintiff identifies four actions that purportedly constituted adverse employment actions: (1) plaintiff's work assignments; (2) plaintiff's request for leave; (3) plaintiff's disagreement with her supervisors' failure to increase her pay; and (4) plaintiff's complaint that she was unable to see her union steward within two hours. *See* Pretrial Order Part 3.a. (Doc. 45 at 3–7). Defendant contends that none of these actions amount to adverse employment actions sufficient to support a discrimination or retaliation claim. The court addresses each one below.

## 1. Plaintiff's Work Assignments

Defendant asserts that plaintiff's disagreement with the job tasks her supervisors assigned her are not adverse employment actions. Defendant argues that plaintiff's criticism about how

her supervisor exercised authority is not an adverse employment action. *See Young v. White*, 200 F. Supp. 2d 1259, 1272–73 (D. Kan. 2002) (no adverse employment action when a supervisor assigns tasks within his authority even though plaintiff "might disagree with the tasks that are assigned or with the decision to give certain tasks to certain individuals" because such assignment did not "alter[ ] plaintiff's employment status in any way or had any negative effect on plaintiff's standing within the organization."). Defendant also contends that undesirable jobs falling inside a plaintiff's work restrictions do not constitute adverse employment actions. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (holding no adverse action when job reassignments did not significantly alter the terms and conditions of plaintiff's job). The court agrees. Defendant's assignments of job tasks within plaintiff's restrictions are not adverse employment actions, even if she deems the assignments undesirable. So, for example, plaintiff's assignment to perform EVS sampling duties when Loose-In-Mail work was available is not an adverse action sufficient to support a discrimination or retaliation claim.

But, other aspects of plaintiff's complaints go beyond the mere assignment of undesirable tasks. Plaintiff asserts that defendant required her to perform tasks that exceeded her work restrictions. Plaintiff also contends that, at least once, she complained to her supervisor that an assignment was beyond her restrictions. In response, plaintiff's supervisor told her that it was the only work available and that she (the supervisor) would decide where plaintiff would work. As discussed above, defendant disputes plaintiff's version of the facts. The parties' conflicting views of the evidence create fact issues that the court cannot resolve on summary judgment.

Defendant's failure to provide reasonable accommodations may serve as an adverse employment action sufficient to support plaintiff's discrimination and retaliation claims on summary judgment. *See Douglas v. Gen. Motors Corp.*, 982 F. Supp. 1448, 1452 (D. Kan. 1997)

(Lungstrum, J.) (concluding that plaintiff satisfied the second element of an ADA retaliation claim by asserting that she suffered an adverse employment action based on defendant's "refusal to accommodate"); *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) ("Adverse employment decisions in [the ADA] context include refusing to make reasonable accommodations for a plaintiff's disabilities.").  Plaintiff has presented sufficient evidence for a jury to conclude that defendant engaged in an adverse action by failing to accommodate her disability.  Plaintiff's discrimination claim thus survives summary judgment.  But, plaintiff's retaliation claim fails because she has not established a casual or temporal link between plaintiff's work assignment and the protected activity of filing an EEO complaint sufficient for her retaliation claim to survive summary judgment.

Plaintiff asserts that she has established the requisite causal link because she alleged in her September 2010 EEO complaint that Ms. Watson and Ms. Lackner assigned her work beyond her restrictions and these two supervisors assigned her such work continuously after she filed the complaint.  Indeed, in plaintiff's November 2011 EEO complaint, plaintiff again alleged that her supervisors had instructed her to perform work outside of her restrictions since April 2010.  Plaintiff's asserted timeline cannot support a causal link between her EEO complaint and the work assignment because she alleges that her supervisors gave her the assignments starting months *before* she filed the EEO complaint in September 2010.   Plaintiff provides no other facts from which a jury could infer a causal connection between her supervisor's assignments and her EEO complaint.  Plaintiff also alleges that she engaged in protected activity by requesting reasonable accommodations, but she provides no facts from which a jury reasonably could infer that her supervisors continued assigning her work outside of her restrictions because she had requested reasonable accommodations.  Without evidence giving a jury a sufficient evidentiary

basis to infer a causal link between defendant's failure to accommodate plaintiff and the protected activity, plaintiff's retaliation claim fails as a matter of law.

### 2. Plaintiff's Request for Leave

Defendant asserts that the summary judgment facts fail to support plaintiff's claim that defendant denied her request for sick leave. Defendant has established that plaintiff requested leave for dependent care for her husband's surgery on September 13, 2011. Ms. Watson granted plaintiff's leave request, and USPS placed plaintiff on paid leave status for that day. The placement of an employee on one day of paid leave is not an adverse employment action because it does not change the employee's status, pay, or benefits. *See, e.g.*, *Armstead v. Wood*, No. 10-cv-02783-CMA-KMT, 2012 WL 2298495, at *7 (D. Colo. June 15, 2012) (holding that plaintiff's placement on paid leave was not an adverse employment action); *see also Gerald v. Locksley*, 785 F. Supp. 2d 1074, 1117 (D.N.M. 2011) (same).

Plaintiff does not respond specifically to defendant's argument. Instead, plaintiff states only:

> Defendant argues that the actions complained of do not constitute adverse employment actions sufficient to maintain a claim under the ADA. Viewing the evidence in the light most favorable to Plaintiff, a jury could find otherwise.

Doc. 50 at 1. This *ipse dixit* response is insufficient to create a triable issue for the jury. Plaintiff has failed to present evidence sufficient to establish that the way defendant responded to her leave request constituted an adverse action. Plaintiff thus cannot support a discrimination or retaliation claim based on her leave request.

### 3. Plaintiff's Disagreement with Pay

Defendant asserts that plaintiff's supervisor did not engage in an adverse employment action when she deleted plaintiff's incorrect time entries, or clock rings. The undisputed

evidence establishes that plaintiff's supervisor deleted plaintiff's clock rings because plaintiff

had used the wrong operational number to clock in.  Plaintiff's supervisor replaced the wrong

operational code with the code for Grade Level 6 pay—the pay rate assigned to plaintiff's job.

The correction of plaintiff's clock rings so they reflect her accurate pay level is not an adverse

employment action.  *See Scott v. Donahoe*, 913 F. Supp. 2d 355, 367 (W.D. Ky. 2012) (holding

that defendant's correction of plaintiff's incorrect clock rings was not an adverse employment

action); *see also Garcia v. Bd. of Regents of the Univ. of N.M.*, No. 09-0203-RB/RHS, 2010 WL

2606285, at *8 (D.N.M. June 2, 2010) (holding that defendant's delay in depositing plaintiff's

paycheck so that defendant could correct an overpayment and pay plaintiff the accurate salary

was not an adverse employment action).

      Plaintiff also fails to show that defendant failed to pay her the correct level of pay for the

tasks she performed.  Only USPS managers and supervisors can authorize a higher level of pay

for an employee.  In-Plant Support determined the level of pay for employees' jobs and duties.

Supervisors on the floor did not make pay determinations.  Although the summary judgment

evidence establishes that plaintiff *believed* USPS should have paid her at a higher rate to perform

certain job duties, she submits no evidence to substantiate her belief.  Specifically, plaintiff

believes she was entitled to a higher pay rate in three instances.

      First, plaintiff used an operational code reserved for Dock Clerks (a Grade Level 7

position) when she performed the drop shipment work.  But, defendant has established that this

task was only one of the job duties assigned to Dock Clerks.  Plaintiff's performance of this

single job duty did not entitle her to a higher rate of pay.  Also, USPS had authorized only one

Dock Clerk to work at a time so plaintiff's clock rings made the system reflect, erroneously, that

two Dock Clerks were working.  Second, plaintiff contends that USPS should have paid her at

the same level as the BMEU clerk, Vicki Hackett, when she performed the EVS sampling duties assigned to Ms. Hackett while she was on vacation. But, defendant has established that the EVS sampling was only a portion of Ms. Hackett's job duties. Plaintiff's performance of this one aspect of Ms. Hackett's job did not entitle her to the same higher rate of pay that Ms. Hackett received. Finally, plaintiff believes that an employee named Z. Malik was entering a higher level operating number when he performed EVS sampling. But, the only evidence in the summary judgment record establishes that Mr. Malik did not receive a higher level of pay for any Dock Clerk functions that he performed along with plaintiff. From these facts, no jury could conclude that defendant failed to pay plaintiff at the appropriate level of pay. To the contrary, the summary judgment record shows that defendant paid plaintiff for the Grade Level 6 position that she performed.

Plaintiff fails to respond specifically to defendant's argument that the changes to plaintiff's clock rings or her disagreement with her pay did not constitute adverse employment actions. And, even if she did, the evidence described above establishes that no adverse employment action occurred. The court thus grants summary judgment against plaintiff's discrimination and retaliation claims to the extent plaintiff bases them on her supervisor's changes to her clock rings or her disagreement with her level of pay.

#### 4. Delay in Meeting with the Union Steward

Finally, defendant asserts that plaintiff cannot establish an adverse employment action based on her claim that defendant prevented her from speaking with her union steward within two hours of her request. Defendant first argues that plaintiff should bring this claim under the union contract because it asserts a contractual right. But, defendant observes, the union has never filed a grievance on plaintiff's behalf. Defendant also asserts that plaintiff cannot establish

that her inability to speak with a union steward within two hours changed the terms and conditions of her employment sufficient to constitute an adverse employment action.

Plaintiff fails to respond, specifically, to either of defendant's arguments. Arguably, her failure amounts to a waiver of this issue. *See In re FCC 11-161*, 753 F.3d 1015, 1100–01 (10th Cir. 2014) (rejecting petitioners' argument because their reply brief was silent on an issue and made no attempt to rebut the respondents' argument); *see also Parker v. Bd. of Cty. Comm'rs of Shawnee Cty., Kan.*, No. 01-2544-CM, 2002 WL 31527763, at *1 (D. Kan. Nov. 5, 2002) (deeming plaintiff's claims "abandoned or waived by plaintiff's failure to respond" (citing D. Kan. Rule 7.4(b))). Nevertheless, the court concludes that plaintiff has not set forth sufficient facts to establish an adverse action based on her request to meet with her union steward.

USPS supervisors follow a general rule of arranging a meeting between an employee and the union steward within two hours of the employee's request. But, the timing of the meeting depends on the union steward's availability, any pressing needs on the job that the employee must perform, and the mail volume. Plaintiff concedes that she spoke to her union steward many times about her concerns with her working conditions, including her belief that supervisors were assigning her work outside of her medical restrictions. Plaintiff also gave her union steward written statements about these concerns. Plaintiff's union steward told plaintiff that she could refuse to perform job duties that exceeded the scope of her restrictions.

Under these facts, plaintiff fails to establish that any delay in meeting with her union steward changed her employment status sufficient to constitute an adverse employment action. *See Cantu v. Potter*, No. EP-08-CV-349-KC, 2010 WL 1417743, at *9 (W.D. Tex. Apr. 5, 2010) (holding that a six-day delay in meeting with a union steward did not constitute an adverse employment action sufficient to establish a prima facie case of discrimination). The court thus

grants summary judgment against plaintiff's discrimination and retaliation claims to the extent

they are based on her complaint about the delay in speaking with her union steward.

### D. Pretext

Defendant asserts that, even if plaintiff could establish that defendant engaged in an

adverse employment action that was casually or temporarily linked to her disability or her 2010

EEO complaint, she fails to establish that defendant's actions were pretext for discrimination or

retaliation.  The court applies the *McDonnell Douglas* burden-shifting framework to plaintiff's

discrimination and retaliation claims.  *See Dewitt v. Sw. Bell Tele. Co.*, __ F.3d __, 2017 WL

192685, at *4 (10th Cir. Jan. 18, 2017) (applying the framework to ADAAA discrimination and

accommodation claims); *see also Poulsen v. Humana Ins. Co.*, __ F. App'x __, 2017 WL 56285,

at *4 (10th Cir. Jan. 5, 2017) (applying the framework to an ADAAA retaliation claim).

Plaintiff fails even to address the pretext prong of the *McDonnell Douglas* analysis in her

Response to defendant's summary judgment motion.  So, even if the acts above constitute

adverse actions sufficient to support a discrimination or retaliation claim, plaintiff has failed to

satisfy her burden to "'to show a genuine issue of material fact' that the defendant's proffered

reason is a pretext designed to mask discrimination" or retaliation.  *See Adair*, 823 F.3d at 1304

(quoting *MacKenzie*, 414 F.3d at 1274); *see also Poulsen*, 2017 WL 56285, at *4 (explaining

that the third prong of the *McDonnell Douglas* test requires a plaintiff asserting a retaliation

claim to demonstrate pretext).  The court thus grants summary judgment against all but one of

plaintiff's disability discrimination and retaliation claims on this alterative basis.

The only remaining discrimination claim is based on defendant's alleged failure to

accommodate plaintiff's disability by requiring her to work outside of her medical restrictions.

The court recognizes that defendant denies this occurred.  But, as explained above, the summary

judgment record presents a genuine issue of fact about this dispute. Thus, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for assigning plaintiff work outside of her restrictions. Defendant, of course, does not provide a reason because it disputes that such assignment ever occurred. Defendant thus has not met its burden under the second prong of the *McDonnell Douglas* test. And, the court need not reach whether plaintiff has established pretext at summary judgment under the third prong of the test. The court thus denies summary judgment against plaintiff's disability discrimination claim based on defendant's failure to accommodate plaintiff's disability.

### E. Hostile Work Environment

Finally, the court turns to plaintiff's hostile work environment claims. Plaintiff contends that defendant's denial of her requests for reasonable accommodation and violations of her medical restrictions created a hostile work environment. Plaintiff alleges that she was subject to this alleged harassment because she is disabled and engaged in protected activity.[1]

To establish a hostile work environment claim under the ADAAA, a plaintiff must "present evidence from which a rational jury could find that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment, and the harassment stemmed from disability-related animus." *Schlecht v. Lockheed Martin Corp.*, 626 F. App'x 775, 779 (10th Cir. 2015) (citing *MacKenzie*, 414 F.3d at 1280); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410

---

[1]      Although the Tenth Circuit has not recognized formally the existence of retaliatory hostile work environment claims, *Kline v. Utah Anti-Discrimination and Labor Div.*, 418 F. App'x 774, 780 n.2 (10th Cir. 2011), our court has noted "[w]ithout addressing whether the Tenth Circuit recognizes a claim for a retaliatory hostile work environment based solely on plaintiff's prior EEO activity . . . that '[o]nly severe or pervasive workplace conduct that affects the terms, conditions, or privileges of employment are protected by Title VII.'" *Lombardo v. Potter*, 368 F. Supp. 2d 1178, 1196 (D. Kan. 2005) (first quoting *Hounton v. Gallup Indep. Co.*, 113 F. App'x 329, 332 (10th Cir. 2004); then citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

(10th Cir. 1997) ("To survive summary judgment, the plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was based on the victim's . . . disability.").

Defendant asserts that the undisputed evidence fails to establish that plaintiff's work environment was sufficiently severe and pervasive to support a hostile work environment claim. The court agrees. Defendant has employed plaintiff in two different modified positions since 2002. Plaintiff's hostile work environment claim is premised on various assignments that she received in her position. As explained above, plaintiff's disagreements with those assignments, her preference to perform different tasks over others, and her erroneous belief that she was entitled to a higher level of pay for certain tasks do not amount to adverse employment actions. These same actions are not unlawful harassment because they were not severe and pervasive actions that altered the terms, conditions, and privileges of employment.

Plaintiff's complaints that her supervisors failed to accommodate her disability by requiring her to work outside of her restrictions also fail to establish a hostile work environment claim. Although the court concluded above that plaintiff has presented sufficient evidence to support a failure to accommodate claim, these same facts fail to demonstrate severe and pervasive harassment. It is undisputed that plaintiff was responsible for performing her assigned work duties in a way that does not exceed her medical restrictions. It is also undisputed that plaintiff's supervisors expected plaintiff to refuse any job assignment that she believed was not within her medical restrictions and plaintiff's union steward told plaintiff that she could refuse to perform job duties that exceeded the scope of her restrictions. But the record contains evidence of just two instances when plaintiff complained that her supervisor was assigning her tasks that

violated her work restrictions.  On one occasion, plaintiff testified that her supervisor told her it was the only work available and that she decided where plaintiff would work because she was the supervisor.  But, on another occasion, plaintiff informed Ms. Watson that she could not perform the slides work because it was unsafe.  In response, Ms. Watson assigned plaintiff a different task, and she never assigned plaintiff the slides work again.  On this record, no reasonable jury could find that defendant's failure to accommodate plaintiff was so abusive that it created a hostile work environment.  *See Holly v. Pritchett*, No. IP-01-0889-C-T/G, 2004 WL 2757871, at *15 (S.D. Ind. Sept. 30, 2004) (holding that although defendant's "failure to provide [plaintiff] with assistance . . . supports [plaintiff's] failure to accommodate claim and could be considered insensitive and uncaring, it cannot be characterized as abusive such that it would create a hostile work environment").

In sum, the summary judgment record does not contain disputed facts sufficient to show that defendant's conduct created a hostile work environment.  Thus, plaintiff's hostile work environment claim fails as a matter of law.

## IV.   Conclusion

For the reasons explained above, the court denies defendant's summary judgment motion against plaintiff's failure to accommodate claim.  The court also denies summary judgment against plaintiff's disability discrimination claim to the extent it is based on defendant's alleged failure to accommodate plaintiff.  But the court grants summary judgment against plaintiff's disability discrimination claim on all other bases.  The court also grants summary judgment against plaintiff's retaliation and hostile work environment claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Motion for Summary Judgment (Doc. 46) is granted in part and denied in part.

32

**IT IS SO ORDERED.**

**Dated this 2nd day of February, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**